UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__10/16/2014__

-------------------------------------------------------------- X
                                                :

YESSENIA RIOS on behalf of J.C.,       :
                                                :

                                    Plaintiff,  :           12-CV-6956 (VEC)
                                                :

                    -against-        :           OPINION & ORDER
                                                :

CAROLYN W. COLVIN,             :
Acting Commissioner of Social Security,   :
                                                :
                               Defendant. :
                                                :
-------------------------------------------------------------- X

VALERIE CAPRONI, District Judge:

     Yessenia Rios ("Plaintiff") brought this action *pro se* on behalf of her son, J.C., pursuant

to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of a final

decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA")

denying J.C.'s application for Supplemental Security Income ("SSI") benefits.[1]  The

Commissioner moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  For the reasons set forth below, the Commissioner's motion is

GRANTED.

## I.      BACKGROUND

### a.  Procedural History

     Plaintiff filed for SSI on September 8, 2011, claiming that her four and a half year old

son was disabled because of attention deficit hyperactivity disorder ("ADHD"), speech delay,

---

[1]      Parents who are not attorneys generally may not pursue actions in federal court on behalf of their minor children without representation by counsel. *Machadio v. Apfel*, 276 F.3d 103, 106 (2d Cir. 2002) (citing *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990)).  The Second Circuit has carved out an exception for applications for SSI, however, if the parent "has a sufficient interest in the case and meets basic standards of competence." *Id.* at 107.  Plaintiff meets the minimum threshold.

and asthma.  R. 48.[2]  Her claim was denied on December 12, 2011.  R. 11.  Plaintiff requested a

hearing, which was held before an administrative law judge ("ALJ") on January 30, 2012.  R.

11.[3]  In an opinion dated February 3, 2012, the ALJ concluded that J.C. was not disabled within

the meaning of the Act.  R. 8.  The Appeals Council denied Plaintiff's request for review on July

16, 2012, making the February 3, 2012, opinion the final decision of the Commissioner.  R. 1.

Plaintiff commenced this action by timely filing a form complaint on September 13, 2012.  R. 2.

The Commissioner filed a motion for judgment on the pleadings on April 13, 2014.  R. 19.

### b.  Facts

At the time of his application for SSI, J.C. was on medication to treat asthma, from which

he had suffered since he was one year old.  R. 104, 164.  Plaintiff claimed that in addition to

asthma, J.C. had a history of behavior and speech problems.  R. 35, 104.  He had been

discharged from preschool due to his bad behavior and had received speech therapy in the past.

R. 106, 108.  At the time of the SSI application, J.C. was no longer enrolled in speech therapy.

R. 108.

J.C. underwent multiple clinical and medical evaluations to assist in the determination of

whether he was disabled.  On November 7, 2011, Dr. Howard Tedoff, Ph.D., conducted a Child

Intelligence Evaluation.  R. 156-159.  According to the Intelligence Evaluation, J.C. had an

overall IQ of 80, which put him in the ninth percentile.  R. 156.  J.C. was able to follow and

attend to "some age-appropriate directions and complete some age-appropriate tasks."  R. 156.

J.C. was a "very active child" but his "manner of relating, social skills and overall presentation

were adequate."  R. 157.  Dr. Tedoff concluded that although the "results of [J.C.'s] examination

---

[2]       Citations to the administrative record, Dkt. 11, are marked "R."

[3]       Plaintiff appeared at the hearing without an attorney and stated that she wished to proceed *pro se* after the
ALJ informed her of her right to counsel.  R. 27-37.

do not appear to be consistent with cognitive problems that would significantly interfere with his ability to function on a daily basis," "there may be some language processing issues and behavioral problems that may require some special education intervention." R. 159. Dr. Tedoff diagnosed J.C. as having ADHD, asthma, congestive cough and anemia. R. 169.

Mindy Singer, a speech and language pathologist, conducted a speech and language evaluation. R. 160-63. Singer noted that J.C. had a "variable attention span," with "significant difficulty maintaining consistent focus on structured language tasks." R. 160. He "became increasingly distractible, fidgety, and impulsive" as the exam went on. R. 160. Singer concluded that J.C. had "normally developing receptive language and a mild expressive language delay." R. 161. Singer specifically noted that her evaluation of J.C.'s speech was inconsistent with the assertions that his mother had made in the disability application. R. 162. Singer diagnosed J.C. with mild expressive language delay and poor attending and focusing skills; she determined that speech and language services were not recommended at that time. R. 162.

Dr. William Lathan, M.D., conducted a pediatric examination of J.C. the same day. R. 164-67. Dr. Lathan observed that J.C.'s general appearance, behavior, ability to relate to the examiner, and attention span were all normal for his age. R. 165. J.C. did not appear to suffer from cyanosis[4] or respiratory distress, R. 165, his chest and lungs were clear, and his chest wall excursion and movements were normal, R. 166. Dr. Lathan concluded that J.C. did not have any physical or speech impairments and could participate fully in age-appropriate educational, social, and recreational activities. R. 167. As with any child with asthma, Dr. Lathan observed that J.C.

---

[4]     Cyanosis is a bluish discoloration in the skin or mucus membranes that is usually due to a lack of oxygen in the blood. Cyanosis, A.D.A.M. Medical Encyclopedia, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/003215.htm.

may experience "periods of diminished functional capacity secondary to bronchial asthma."  R. 167.

Subsequently, Dr. James McKnight, child psychiatrist with the Jewish Board of Family Services ("JBFS"), completed a questionnaire about J.C.'s treatment history.  R. 170-77.  Dr. McKnight noted that J.C. had begun treatment on October 3, 2011, and had participated in five weekly visits to JBFS.  R. 171.  Dr. McKnight noted that, at intake, J.C. spoke spontaneously with appropriate volume, but his ability to use words to express his thoughts was somewhat limited.  R. 174.  J.C. reported feeling angry but appeared happy.  R. 174.  He was "very reactive, showing extremely limited tolerance for frustration" and "became angry quickly."  R. 174.  J.C. "moved from thing to thing, not sustaining focus for any period of time."  R. 174.  Dr. McKnight noted that J.C. did not appear to have an age-appropriate fund of knowledge.  R. 174.  He also noted that J.C. acknowledged his behavioral problems but had limited judgment and did not otherwise accept responsibility for his behavior.  R. 174.  Based on J.C.'s symptoms, including hyperactivity, impulsiveness, being easily distracted, and aggressive behavior, Dr. McKnight's initial clinical impression suggested a diagnosis of ADHD, combined type, and he ruled out oppositional defiant disorder ("ODD").  R. 173.  Dr. McKnight also noted that J.C. had been evaluated at Montefore Medical Center, and those results indicated mixed receptive expressive language disorder.  R. 173.

Dr. M. Puttanniah, a consulting pediatrician, reviewed J.C.'s records and completed a Child Disability Evaluation Form, dated December 8, 2011.  R. 178-85.  Dr. Puttanniah noted that J.C.'s impairments were asthma, obesity, ADHD, and mild expressive language delay, and concluded that these impairments were severe but did not meet, medically equal, or functionally equal the listings set forth in the Act.  R. 180, 185.  Dr. Puttanniah found that J.C. had a marked limitation in the domain of attending and completing tasks, less than marked limitation in the

4

domains of acquiring and using information and interacting and relating with others, and no limitation in the domains of moving about and manipulating objects, caring for himself, and health and physical well-being.  R. 182-83.

Before the hearing with the ALJ on January 30, 2012, Plaintiff provided nine "incident reports" that she had received from J.C.'s daycare program for incidents that occurred between December 22, 2011, and January 25, 2012; she said that her daycare provider would not provide her with official records because J.C. had been dismissed for behavioral problems.  R. 152, 200-08.  Shortly before the hearing, the New York City Department of Education had approved an Individualized Education Plan ("IEP") for J.C. that placed him in special education classes for two and a half hours daily, occupational therapy twice a week for thirty minutes, and counseling once a week for thirty minutes.  R. 186-99.  J.C. began special schooling in January 2012.  R. 31.

At the administrative hearing, Plaintiff testified that J.C. had started school pursuant to the IEP in mid-January 2012 and had to miss some school because of asthma; Plaintiff did not provide any dates or documentation of such asthma attacks.  R. 31.  Although J.C. was on medication to treat his asthma, R. 33, he was not taking any medication for ADHD, R. 33.[5] Plaintiff testified that J.C. had been receiving therapy at JBFS once a week since early October and also at the new special education school where he was enrolled.  R. 34.  According to Plaintiff, J.C. and his younger brother did not get along well because J.C. was "too aggressive." R. 35.  Plaintiff reported that the boys constantly fought and the fights frequently ended with one

---

[5]       J.C.'s pediatrician, who had treated J.C. from birth, told Plaintiff that J.C.'s behavior was normal and age appropriate and not a hyperactivity issue.  R. 33.  At the time of the hearing, Plaintiff was seeking a second opinion and had an appointment scheduled with a psychiatrist to determine whether medication would be appropriate.  R. 33, 35.  In May 2012, subsequent to the hearing before the ALJ, a doctor at Harlem Hospital concurred with Plaintiff and started J.C. on Adderall.  Pl. Mem. Law Opp. at 1, 3.

of them hurt.  R. 35.  J.C. frequently interrupted the hearing with questions or interruptions of

Plaintiff's answers, which Plaintiff testified was common behavior.  R. 32.

## II.      DISCUSSION

### a.  Standard of Review

When reviewing an appeal from a denial of disability benefits, courts are not to determine

*de novo* whether a claimant is disabled but are "limited to determining whether the SSA's

conclusions were supported by substantial evidence in the record and were based on a correct

legal standard."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (citation

omitted).  *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to

any fact, if supported by substantial evidence, shall be conclusive," and "where a claim has been

denied . . . the court shall review only the question of conformity with [the] regulations . . . .").

Courts must "conduct a plenary review of the administrative record" and "determine if there is

substantial evidence, considering the record as a whole, to support the Commissioner's

decision."  *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (Sotomayor, J.) (quoting *Shaw v.

Chater*, 221 F.3d 126, 131 (2d Cir. 2000)).  "Substantial evidence" means "more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Pollard v. Halter*, 377 F.3d 183, 188 (2d Cir. 2004) (quoting *Richardson

v. Perales*, 402 U.S. 389, 401 (1971)).  Courts are "required to examine . . . contradictory

evidence from which conflicting inferences can be drawn" in determining whether the

Commissioner's decision was supported by substantial evidence, *Selian*, 708 F.3d at 417

(quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (*per curiam*)), but defer to the

Commissioner's resolution of conflicting evidence, *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115,

118 (2d Cir. 1998).

"Although factual findings by the commissioner are binding when supported by substantial evidence, where an error of law has been made that might have affected the disposition of the case," a federal court "cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.  Failure to apply the correct legal standards is grounds for reversal."  *Pollard*, 377 F.3d at 188-89 (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)) (internal quotation marks and alterations omitted).  Where there is a "reasonable basis for doubt whether the ALJ applied correct legal principles," courts should not simply apply the "substantial evidence standard to uphold a finding of no disability" because it "creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to the correct legal principles."  *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (quoting *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).  "Where application of the correct legal standard could lead to only one conclusion," however, the court "need not remand."  *Id.*

To qualify for disability benefits, a child must have a "medically determinable physical or medical impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382(a)(3)(C)(i).  The Commissioner of Social Security adopted regulations that require a three-step evaluation to determine whether a child qualifies for disability benefits.  20 C.F.R. § 416.924; *see Pollard*, 377 F.3d at 190.  First, the ALJ must consider whether the child is engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  Second, the ALJ must consider whether the child has a "medically determinable impairment that is severe," which means the impairment causes "more than minimal functional limitations."  20 C.F.R. § 416.924(b).  Finally, if the ALJ finds a severe impairment, the ALJ must then consider whether the impairment meets or is the medical or functional equivalent of an

impairment listed in Appendix 1, Subpart P of 20 C.F.R. § 404 (the "Listings").  20 C.F.R. § 416.924(c)-(d); *see Encarnacion ex rel. George v. Barnhart,* 331 F.3d 78, 84 (2d Cir. 2003).  If a child does not "meet" or "medically equal" one of the Listings, he may nonetheless be entitled to SSI if his impairment or combination of impairments results in limitations that are functionally equal to the Listings.  20 C.F.R. § 416.926a(a).[6]

### b.  The ALJ's Decision

On February 3, 2012, the ALJ found that J.C. was not disabled within the meaning of the Act since September 8, 2011, the date J.C.'s application was filed.  R. 7.  At step one of the analysis, the ALJ determined that J.C. was not engaged in substantial gainful activity during the relevant period.  R. 10.  At step two, the ALJ found that J.C.'s ADHD, history of behavioral abnormalities, and asthma were "severe impairments."  R. 10.  At step three, however, the ALJ determined that the evidence in the record failed to establish that J.C.'s impairments, individually or in combination, met or medically equaled one of the impairments in the Listings.  R. 10.

In reaching that conclusion, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of J.C.'s impairments were not credible because they were not substantiated by objective medical evidence.  R. 11.  The ALJ noted that J.C. was not on ADHD medication and had only recently begun to see a psychiatrist.  Although the daycare records were evidence that J.C. had behavioral problems, Dr. McKnight, a psychiatrist at JBFS, wrote that J.C. had not been diagnosed with any behavior disorders after five therapy visits.  R. 11.  J.C. used medication to control his asthma, but the record showed only one emergency room

---

[6]     To demonstrate "functional equivalence," the child must exhibit "extreme" limitation in one, or "marked" limitation in two, of the six domains listed in 20 C.F.R. § 416.926(a): (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  20 C.F.R. §§ 416.926a(a), 416.926a(b)(1).  When evaluating functional equivalence, an ALJ must "assess the interactive and cumulative effects of all the impairments for which [there is] evidence, including any impairments" that are not "severe."  20 C.F.R. § 416.926a(a).

or hospital visit allegedly due to asthma and that visit was more than one year before the ALJ's decision. R. 11.[7] In short, there was no medical evidence to support Plaintiff's assertions regarding the severity of J.C.'s ADHD or asthma and the medical evidence that was presented supported the ALJ's conclusion that J.C. was not disabled. R.11.

Next, the ALJ considered whether J.C.'s impairments functionally equaled the Listings. R. 10. At this step, he considered evidence from the various medical professionals who had treated J.C. or reviewed his records. R. 10. Specifically, the pediatrician concluded that J.C. could participate fully in educational, social, and recreational activities, other than a possible diminished functional capacity due to his asthma. R. 10. The intelligence evaluation confirmed low average intelligence, R. 10, and the speech/language evaluation revealed normal receptive language level with mildly delayed expressive language skill. R. 10. Finally, the consulting pediatrician who reviewed J.C.'s records concluded that J.C. did not have any extreme limitation and did not have two marked limitations in the six childhood domains. R. 10.

The ALJ further considered J.C.'s limitations with respect to the six domains of function. R. 12-17. He determined that J.C. had a less than marked limitation in the following domains: acquiring and using information, attending and completing tasks, and moving about and manipulating objects. R. 12-15. He found that J.C. had no limitation in the domains of caring for oneself and health and physical well-being. R. 15-17. Finally, he concluded that J.C. had a marked limitation in interacting and relating with others. R. 13-14.

In assessing J.C.'s limitation in the domain of acquiring and using information, the ALJ relied on J.C.'s IQ test that confirmed a low average range of intelligence. R. 12. The

---

[7]     The one emergency room visit in the record appears to be unrelated to asthma. J.C. complained of a fever around 102 degrees Fahrenheit and was diagnosed with strep pharyngitis. R. 124.

speech/language evaluation showed that J.C. was able to communicate effectively and had a normal receptive language level, despite mildly delayed expressive language skills.  R. 12.

In assessing J.C.'s limitation in the domain of attending and completing tasks, the ALJ noted that J.C. had only recently been diagnosed with, and begun treatment for, ADHD.  R. 13. Although he demonstrated hyperactivity, aggressiveness, and impulsive behavior, he had not yet been fully evaluated.  R. 13.  Further, although two of the consultative examiners noted J.C.'s hyperactivity, Dr. Lathan found J.C. displayed normal behavior and normal attention span during his examination.  R. 13.[8]  Dr. Puttinnah, the consulting pediatrician, had opined that J.C.'s limitation in this area was "marked" based on the speech/language evaluation that showed J.C. had "great difficulty with maintaining focus and was easily distracted, fidgety and impulsive" and the intelligence exam, that showed J.C. was able to follow and understand age-appropriate directions.  R. 182.

In assessing J.C.'s limitation in moving about and manipulating objects, the ALJ noted that J.C.'s school records mentioned that J.C. had difficulty with fine motor skills but normal gross motor skills and that J.C. was scheduled to begin occupational therapy pursuant to his IEP. R. 15.  The ALJ relied on Dr. Lathan's opinion that J.C. displayed age-appropriate fine motor activity and had no physical impairments to conclude that J.C. had a less than marked limitation on this domain.  R. 15.

The ALJ found no limitation in the domain of caring for himself because the Plaintiff did not allege any limitation that affected this domain.  R. 16.  In addition, the ALJ relied on the opinion of Dr. Puttinnah that J.C. did not have any physical impairments or speech impairments. R. 16.  As far as J.C.'s asthma, the ALJ determined it was not a limitation because J.C. had not

---

[8]      As noted in note 5, *infra*, that evaluation was consistent with the evaluation of J.C.'s past primary care pediatrician.

required any hospitalizations or emergency room care in over a year; thus, his asthma appeared to be well controlled by his medication.  R. 16.

 In determining that J.C. had a marked limitation in the domain of interacting and relating with others, the ALJ relied on Plaintiff's statements about J.C.'s behavior difficulties at school and at the playground and his inability to get along with his younger brother.  R. 14.  The ALJ also found that the six daycare incident reports in the span of one month supported the conclusion that he had difficulty interacting with others.  R. 14.

On the basis of these findings, the ALJ concluded that J.C. was not disabled under the Act, and denied his request for benefits.

### c.  Analysis

The ALJ failed to compare J.C.'s impairments arising from ADHD and asthma to those specific Listings and to explain why J.C. did not meet the Listings.  That was legal error. Remand is not, however, necessary in this case because application of the correct legal standard to the facts as found by the ALJ could lead only to one conclusion: J.C.'s impairments did not meet or medically equal the Listings.[9]

---

[9]     The Court is cognizant that it "may not properly 'affirm an administrative action on grounds different from those considered by the agency.'"  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)).  In *Burgess*, the Second Circuit remanded to the Commissioner because the ALJ overlooked evidence in the record that strongly supported the claimant's alleged disability (an MRI report that showed bulging disc material), failed to provide "good reasons" for discounting the opinion of the claimant's treating physician as required by the regulations, and improperly substituted his own opinion as to the severity of the claimant's pain for that of the claimant's treating physician.  *Id.* at 129-32.  Remand was required rather than outright reversal of the denial of benefits because the record contained evidence contradicting the opinion of the treating physician, and it is for the ALJ to determine, in the first instance, whether such evidence entitled the claimant's treating physician's opinion to less than controlling weight under the regulations.  *Id.* at 132.  Here, by contrast, there was no conflicting evidence that the ALJ did not weigh.  Thus, the agency considered all of the grounds upon which the Court affirms its decision.  "[W]here application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency reconsideration."  *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (quoting *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)) (alterations in *Zabala*).

"It is for the SSA, and not this court, to weigh the conflicting evidence in the record."

*Schaal*, 134 F.3d at 504.  The ALJ's credibility determination regarding Plaintiff's statements

about the intensity, persistence, and limiting effects of J.C.'s symptoms is binding on this Court.

*See id.*  Although the ALJ must "affirmatively develop the record in light of the essentially non-

adversarial nature of a benefits proceeding," *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009),

the record was devoid of any evidence suggesting that J.C. suffered from "marked" inattention,

impulsiveness, or hyperactivity such that he met the Listing for ADHD, other than Plaintiff's

own statements, which the ALJ did not credit.

To meet the Listing for ADHD, a Plaintiff must show medically-documented findings

that J.C. suffered from "marked inattention," "marked impulsiveness," and "marked

hyperactivity."  20 C.F.R. § 404, Subpart P, Appx. 1 § 112.11(A). [10]  A claimant between the

ages of three and eighteen also must show "marked impairments" in at least two of the following

areas: cognitive or communicative functioning; social functioning; personal functioning; or

maintaining concentration, persistence, or pace.  20 C.F.R. § 112.11(B), § 112.02(B)(2).

All of the evidence – aside from Plaintiff's statements – supports the ALJ's conclusion

that, although J.C. may have ADHD, his condition is not severe enough to meet the Listing for

ADHD.  Dr. Tedoff concluded that J.C. did not have cognitive problems that would significantly

interfere with his ability to function on a daily basis.  R. 159.  Singer, the speech and language

pathologist, concluded that J.C. had poor attending and focusing skills but his impairments did

not appear significant and were not consistent with the severity Plaintiff claimed.  R. 162.

Notably, J.C.'s speech and language development were not even severe enough to require

---

[10]      A "marked" limitation is one that "interferes seriously with [the claimant's] ability to independently
initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  It is "more than moderate" but "less than
extreme," or the equivalent of functioning that is "at least two, but less than three, standard deviations below the
mean."  *Id.*

therapy.  R. 162.  Dr. Lathan concluded that J.C. had no physical or speech impairments and a

normal attention span for his age, and that J.C. could participate fully in age-appropriate

activities.  R. 165, 167.  Dr. McKnight's initial clinical impression suggested a diagnosis of

ADHD, but he was not able to definitively diagnose J.C. without further examination.  R. 173.

Significantly, all of these medical conclusions were based on evaluations of J.C. *before* he began

a daily regime of 30mg of Adderall to treat his ADHD.  *See* Pl. Mem. Law Opp. at 1.  *See also*

20 C.F.R. § 416.924a(B)(9) (the effect of medication and other treatment on the claimant's

functioning is one of the factors the SSA considers when evaluating the level of impairment).[11]

Thus, even if the ALJ had conducted a comparison of J.C.'s impairments to the ADHD Listing,

the only conclusion supported by the record was that J.C. was not disabled within the meaning of

the Act.

       The same would be true of the evaluation of J.C.'s disability under the Listing for asthma.

To meet the Listing for asthma, the child must either (1) suffer from chronic asthmatic

bronchitis, which would require medical documentation that the child's one-second forced

expiratory volume (FEV1) meets the criteria for chronic obstructive pulmonary disease, or (2)

---

[11]      In this Court, Plaintiff also submitted a letter from one of J.C.'s special education teachers signed on January 29, 2014.  The letter stated that J.C. is focused and able to complete his academic tasks when he is on his medication.  Pl. Mem. Law Opp. at 3 (letter of Jennifer Maloney).  Although that evidence was not before the ALJ, the Court may consider such "new" evidence if it is "material and there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g); *Pollard*, 377 F.3d at 193.  The Second Circuit has found that there is good cause for failure to submit evidence to the ALJ where the evidence did not exist at the time of the ALJ hearing.  *Pollard*, 377 F.3d at 193.  Ms. Maloney's observations of J.C. when he was on medication did not exist at the time of the ALJ hearing because J.C. was not yet on medication.  The only issue, then, is whether the evidence is "material," which means that it is both (1) "relevant to the claimant's condition during the time for which benefits were denied" and (2) "probative."  *Id.* (citing *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988)).  Because Ms. Maloney's observations meet both of these thresholds, it is proper for this court to consider the new evidence submitted by Plaintiff.  *See id.* at 193-94.  That evidence, however, tends to support the ALJ's conclusion that J.C. does not have a marked or severe functional limitation.  *See Raza ex rel. Z.R. v. Colvin*, No. 13 Civ. 1936 (RWS), 2014 WL 3767045 at *14 (S.D.N.Y. July 24, 2014) ("When an impairment can be controlled by medication, a claimant is not disabled unless he has a justifiable reason for refusing to take the medication." (citation omitted)).

suffer from attacks that require physician intervention occurring at least once every two months or six times a year, in spite of prescribed treatment.  20 C.F.R. § 404, Subpart P, Appx. 1, § 3.03.

The ALJ found that J.C. had *no* impairment in the domain of health and physical well-being, which was based in part on the conclusion that J.C.'s asthma was "well controlled."  J.C. had not required hospitalization or emergency care in over a year, which falls far short of the six times per year required under the asthma Listing.  R. 16; 20 C.F.R. § 404, Subpart P, Appx. 1, § 3.03.  Moreover, Dr. Lathan's physical exam found no signs that J.C.'s asthma caused a deficiency in blood oxygenation or respiratory distress and found that J.C.'s chest and lungs were functioning normally.  R. 165-66.  Although Dr. Lathan concluded that J.C. may suffer from periods of diminished functional capacity, outside of those periods he could otherwise fully participate in the same activities as children his age who did not suffer from asthma.  R. 167.  In short, the record contains no evidence – conflicting or otherwise – that J.C. met the asthma Listing.

Even though J.C.'s ADHD and asthma did not meet the Listing standard, the ALJ also had to consider whether his impairment or combination of impairments functionally equaled the severity of the Listings.  The ALJ's decision that they do not was amply supported by substantial evidence in the administrative record.  None of the doctors or clinicians who examined J.C. or his medical history opined that his impairments were sufficiently severe to qualify as "extreme" or "marked" as those terms are defined by the SSA regulations.  With the exception of the domain of caring for one's self, the ALJ cited specific evidence in the record in support of each conclusion as to the severity of J.C.'s impairment in each of the six domains, *see* Part II(b), *supra*, and resolved credibility issues where they existed.

The Plaintiff did not allege that J.C. had a limitation in caring for himself, and the ALJ noted that none was reflected in the record.  R. 16.  This domain considers how well the claimant

maintains a healthy emotional and physical state, copes with stress and changes in his environment, and cares for his own health, possessions and living area.  20 C.F.R. § 416.926a(k).  As the ALJ's opinion explained, examples of limited functioning in this domain include, *inter alia*, placing inedible objects in the mouth, engaging in self-injurious behavior such as suicidal thoughts or actions or ignoring safety rules, and having disturbances in sleeping patterns.  R. 16.  *See also* 20 C.F.R. § 416.926a(k)(3).  Displaying these behaviors does not necessarily mean the claimant has a "marked" or "extreme" limitation; rather, that determination varies based on the claimant's age and developmental stage and whether the limitation in facts results from a medically determinable impairment.  20 C.F.R. § 416.926a(k)(3).

The record contains evidence that J.C. placed inedible objects in his mouth, had suicidal ideations and was a risk of ignoring safety rules, and experienced irregular sleep patterns.  That evidence is either speculation or derived entirely from Plaintiff's descriptions of J.C.'s symptoms, which the ALJ found not to be credible.  Dr. Tedoff postulated that J.C. "may not be able to note danger and thus take precautions because of his hyperactivity," R. 158, and noted that J.C. did not sleep well at night, R. 156.  The former was speculation; the latter was based solely on Plaintiff's reports regarding J.C.  Dr. McKnight noted that Plaintiff reported that J.C. had expressed suicidal and homicidal ideation, chewed on objects, and threw extreme temper tantrums.  According to J.C.'s mother, he had engaged in head banging and aggressive behavior since the age of one year old.  R. 171.  This evidence was also based entirely on Plaintiff's statements, and Plaintiff admitted in the hearing before the ALJ that J.C.'s pediatrician had determined that J.C.'s behavior was normal for his age and not the result of a behavioral disorder.  *See* R. 35.  Thus, there is no evidence in the record – aside from Plaintiff's statements that the ALJ found not to be credible – that J.C. had any impairment in the domain of caring for himself.  In contrast, there is substantial evidence that supports the ALJ's conclusion that J.C. did

not suffer from any limitation in this domain – specifically Dr. Tedoff's opinion that J.C.'s impairment would not significantly interfere with his ability to function on a daily basis, even before J.C. commenced medication to treat his hyperactivity.

The ALJ's conclusion that J.C. did not have an impairment or combination of impairments that meet, medically equal, or functionally equal the SSA Listings was the only conclusion that can be supported based on the record.

### III.    CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is GRANTED.  The Clerk of Court is respectfully requested to terminate this case, and mail a copy of this Order to the *pro se* Plaintiff.

**SO ORDERED.**

**Date:  October 16, 2014**
**New York, NY**

**VALERIE CAPRONI**
**United States District Judge**